ORIGINAL

FILED IN OPEN COURT
U.S.D.C. Atlanta

OCT 1 2 2017

James N. Hatten, Clerk
By: Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal Indictment |
| *v.* | No. 1:16-CR-427 |
| GORDON EVANS, <br> a/k/a QB; <br> PATRICK CAPLE, <br> a/k/a Zoe; <br> GARY SARTOR, <br> a/k/a G-Stacks, <br> a/k/a Stacks; <br> TYRONE CLARK, <br> a/k/a Tight Eye; <br> JOSEPH RILEY, III, <br> a/k/a Joe Blow; <br> KHAJAVIUS MITCHELL, <br> a/k/a KJ; <br> TASHIED REED, <br> a/k/a Row, <br> a/k/a Tykune; <br> MICHAEL JACKSON, <br> a/k/a Self-Made, <br> a/k/a MJ; <br> BRANDON ASBERRY, <br> a/k/a B5; <br> JIMMY ROSSER, <br> a/k/a Lil' Jimmy, <br> a/k/a Baby Hazo; <br> KIERRA MAHEIA, <br> a/k/a Erra; <br> CETERA BOWLES-GRIFFIN, <br> a/k/a Bella; <br> ALFONZO NALLS, <br> a/k/a Offset; <br> RAEKWON WILLIAMS, <br> a/k/a B-Ray; | (Superseding) <br><br> **UNDER SEAL** |

MARCUS RUSSELL,
   a/k/a Double M;
WESTLY SHIVERS,
   a/k/a Owon;
 CALMETRIUS DAWKINS,
   a/k/a Ballyo;
J'MON HAWKINS,
   a/k/a Monto Pronto;
WAJZIM REED,
   a/k/a Wazi;
EARL SMILEY,
   a/k/a Smiley;
LINNIE ANDREWS;
ADRIAN ANSLEY;
FRED ARCENEAUX;
ERICK BALCAZAR;
SHEENA BROWN;
TREMAINE GARRISON
   a/k/a Paperwork;
CEDRICK HILL,
   a/k/a Ced;
MONIQUE PRESTON;
DEMARIO RIDLEY,
   a/k/a Lil Yo; and
TRAVIS TODD,
   a/k/a T-Raw

THE GRAND JURY CHARGES THAT:

## COUNT 1 (RICO Conspiracy)

### Background

At all times relevant to this Indictment:

1.     In the early 1970s, a group of street gangs united and formed a larger gang called "The Bloods." This gang was formed in Los Angeles, California, but quickly spread to surrounding areas. Thereafter, they expanded across the United States.

2.     The Bloods are broken into individual units known as "sets" each originally identified or affiliated with a certain street, neighborhood, or area. These sets utilize common tattoos, communication codes, language, graffiti markings, and are identified by wearing the color red. Additionally, Bloods maintain a long-term and often lethal rivalry with the Crips gang, whose signature color is blue.

3.     On or about July 16, 1993, within the Rikers Island Prison complex, the "United Blood Nation," or "UBN" was created as a gang alliance among African-American gangs to protect themselves from "The Almighty Latin King Nation," the largest prison gang in the New York prison system at the time. The UBN is the East Coast offshoot of the California-based "Bloods" and its members are only loosely affiliated with West Coast Bloods. There are numerous Blood sets under the UBN umbrella. One of the original sets that unified under the UBN was the "Nine Trey Gangsters" (NTG).

3

4.      As these members were released from prison and migrated, the UBN and NTG spread across New York and eventually down the East Coast and into Southeastern United States.    NTG members are located throughout Georgia, North Carolina, South Carolina, New York, and other states in the Southeastern United States.

5.      While NTG membership is spread across the Southeastern United States, ultimate authority for gang decisions is still maintained in New York and the New York prison system, described by NTG members as "up top."

6.      The structure of NTG is hierarchical in nature.    NTG is subdivided into separate groups or "lines."  Each NTG member has a specific rank within the gang or a specific line, and this rank comes with specific duties and responsibilities.  The rank structure NTG uses is often called a "Line Up."

7.      Each rank is responsible for specific tasks within the gang.  Leadership ranks within NTG and the responsibility of each rank are as follows:

        a.      Godfather  – National leadership over all NTG lines, likely also has authority over all United Blood Nation lines as a member of UBN national council;

        b.      High O20 – Regional/state level leader with national authority over a specific line;

4

     c.      Low O20 – Regional/state level leader who passes information from lower ranking members, including generals (as described below), to members "up top," as well as passes information from "up top," down to the generals;

     d.      5th Floor or 5 Star General – Oversees and provides guidance to the other generals and is responsible for the operation of the NTG membership below him;

     e.      4th Floor or 4 Star General – Aids and assists the 5th Floor in running the generals and the NTG membership below him;

     f.      3rd Floor or 3 Star General – Plans the "wars" or conflicts with other gangs or rivals, provides weapons for NTG members to use;

     g.      2nd Floor or 2 Star General – Collects dues from NTG members, functions as the treasurer, oversees gang meetings or "nines;"

     h.      1st Floor or 1 Star General – Runs the rank and file NTG members in the field and is in charge of ensuring the soldiers and others below him understand gang knowledge and history.  In addition, the 1st Floor holds meetings;

     i.      Green Light – Reports to the 1st floor and oversees a neighborhood or smaller area on the street or a pod or yard behind the wall;

     j.      Scrap or Soldier or Artist – members without rank, obligated to follow orders from gang leadership.

8.    Additionally, within NTG, some females hold unique positions of authority, including that of a "First Lady" who is often responsible for record keeping, covert communications, and distribution of gang records.

9.    The NTG rank structure often includes separate delineation between incarcerated and non-incarcerated members, up to and including a separate Low-020 within the prison system ("behind the wall") and a separate Low-020 "on the street." In many instances, high ranking leadership behind the wall also exerts control over the membership on the street.

10.    NTG is governed by a common set of rules, codes, laws, and oaths (collectively, the "rules"). The rules include, for example:

    a.    Requiring individual gang members to operate and conduct themselves as defined by the rules;

    b.    Procedures for infractions or disciplinary actions;

    c.    Prohibiting by death "Snitching," (also known as "stacking") or cooperating with law enforcement.

11.    The rules also set forth guidance for communications. The most common and accepted methods for communicating are "kites" (letters that are written from prison and are delivered to other prisoners, or smuggled in and out of prison facilities), cellular telephones, contraband cellular telephones, text messaging, prison visitation, face to face meetings, and social media. Inmates have access to

jail telephones in prison, and it is common for prisoners to have access to contraband cellular telephones smuggled into prison facilities that they use for gang communications.

12.    NTG gang members use specific words or codes to communicate with each other in an attempt to avoid detection from law enforcement and rival gangs. Some commonly used words include:

a.    "A&A" - aid and assistance, which means to help a fellow gang member when asked;

b.    "Food," or "Alpo" - gang "knowledge," the rules, gang terminology and gang structure;

c.    "East Side" - loyalty and affiliation to NTG;

d.    "I love my Billies" - a common way of ending a conversation between NTG members. A response of "I love my Billies more" is returned;

e.    "9 shots" - a common greeting between NTG members and "Trey Glocks" is the response;

f.    "Big homie" – a higher ranking member;

g.    "The Whip" and "the line" - a specific subset of NTG set; and

h.    "031" - refers to Blood love.

13.    Code terms are also used to refer to specific actions carried out by NTG gang members or to communicate about intended or performed actions in a secure and covert manner.  For example:

a.    "Lick," or "Rip" - refer to robbery;

b.    "On pause" - a suspension of gang membership;

c.    "DOA" or "Say less" - affirmative acknowledgements expressing agreement between gang members;

d.    "Green light" - permission granted by a higher ranking NTG member to a lower raking member to do an act;

e.    "On the plate" or to be "ate" – targeting of an individual gang member or a non-gang member for some type of physical attack, on the street it means to shoot or kill, in prison it means to stab or beat often resulting in death;

f.    A "Nine" - a gang meeting.  Meetings are the method by which members of the gang gather to discuss gang membership and business, administer punishment, distribute gang literature, and discuss criminal activity.  The Fifth Floor of a particular line designates a lower ranking gang leader to organize Nines and assure attendance of other members.  There are rules that govern the activities to be performed during a "Nine," which include: reciting oaths, collecting gang dues, communicating gang knowledge, discussing rule changes, and issuing punishment;

8

g.    "On the street" – an individual that is not in prison;

h.    "Behind the wall" – an individual in prison;

i.    "Stain," "Floor," or "Rims" - rank within the gang; and

j.    "Putting in work" – to do some activity, often criminal, that brings status to the individual member and promotes the gang in general.

14.    NTG members use the terms "93," "Billy," "Billies," "Billy Bad Ass," "BBA," and "Nine-Trey," among others, as a reference to their set.

15.    Gang dues are collected from each member for the benefit of the NTG organization.  A portion of the dues are saved and utilized locally, while another portion is sent up the chain to gang leadership.  The monies may be used locally for loans to gang members or to post bail for gang members that have been arrested; as gifts to high-ranking members who are in jail as a form of respect; to pay for items used in criminal activity, such as firearms; and the rent of a trap or stash house, and for other gang related purposes.

16.    To become an NTG member, one must be introduced by an existing gang member.  A potential new member is "jumped in" (physically beaten for 31 seconds by gang members) and provided with a copy of NTG history, oaths, and the 31 rules which must be memorized.  This process is referred to as being "brought home" or "going through the fire."  Additionally, some potential new

9

members can be "blessed in," meaning that they can forgo being jumped in if they have the approval of a high-ranking member.

17.    All gang members are required to "put in work," meaning that they must engage in acts of criminal activity such as drug dealing and violence, including when ordered to do so by members of gang leadership.

18.    While NTG gang members can often be identified by the wearing of red clothing, tattoos are also a method of membership identification.  Common NTG tattoos include:

     a.    The letters "M.O.B." which stands for "Member of Bloods;"

     b.    A five-pointed star (the points of the star represent the five points of knowledge within the Bloods:  life, love, loyalty, obedience, and respect and/or love, truth, justice, freedom, and peace);

     c.    The letters "NTG," "BBA," or the numbers "93."

19.    NTG members display distinctive hand signals and other greetings to one another.  Additionally, members use coded language in text messages related to gang activities, and in their written communications, they often replace the letter "c," which is associated with the rival "Crips" gang, with the letter "k," "b," or "x."

20.    At all times relevant to this Indictment, NTG members in Georgia and elsewhere engaged in criminal activity, including, but not limited to: any act

involving murder, assaults, robbery, firearms possession, witness tampering, obstruction of justice, drug trafficking, extortion and conspiracy to commit these crimes, among other crimes. NTG members committed acts of violence against fellow members to maintain membership and discipline within the gang. They also committed acts of violence against non-gang members to maintain the gang's status on the street and in prison and as part of other criminal activity. Members committed acts of violence, including murder, engaged in drug trafficking and other money making criminal conduct, to be promoted and maintain standing within the structure of the gang.

21. At all times relevant to this Indictment, NTG members met and conducted the business of the enterprise, including, but not limited to: initiating new members; providing punishment for violations of the rules of the enterprise (real or imagined); planning acts of violence; reporting on business related to the gang enterprise, including the illegal possession and distribution of drugs, and paying gang dues.

## The Enterprise

22.     At all times relevant to this Count of this Indictment, there existed in the Northern District of Georgia, and elsewhere, an organization, namely, NTG. NTG, including its leaders, members and associates, constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4); that is, a group of individuals associated-in-fact, which engaged in and the activities of which affected interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

## Purposes of the Enterprise

23.     The purposes of the enterprise included, but were not limited to, the following:

        a.     Enriching the leaders, members, and associates of the enterprise through, among other things, drug trafficking, robbery, extortion, and obstruction.

        b.     Promoting and enhancing the enterprise and its members' and associates' activities, including, but not limited to, murder, robbery, drug trafficking, and other criminal activities.

        c.     Preserving and protecting the power, territory, reputation, respect, operations, and proceeds of the enterprise through the use of threats, intimidation,

and violence, including, but not limited to, murder, attempted murder, assault with a dangerous weapon, obstruction of justice, and other acts of violence.

d.    Confronting and retaliating against rival gangs, rival drug dealers, and rival Bloods gangs "sets" or "lines," through the use of intimidation, violence, threats of violence and assaults.

e.    Keeping the community, rivals, and victims and witnesses to crime in fear of the enterprise and in fear of its leaders, members, and associates through threats of violence and actual violence, including murder, attempted murder, assault and intimidation.

f.    Providing assistance to other gang members who committed crimes for and on behalf of the gang.

g.    Hindering, obstructing, and preventing law enforcement officers from identifying, apprehending, and successfully prosecuting and punishing members of the enterprise.

h.    Providing financial support and information to gang members, including leaders who are incarcerated.

i.    Providing an infrastructure to promote criminal activities and schemes within the gang by providing resources, contacts, and a safe haven to conduct activities because of the inherent trust among gang members.

## The Racketeering Conspiracy

24.    Beginning on a date unknown, but starting no later than the year 2013, to

no earlier than the return of this Indictment, in the Northern District of Georgia

and elsewhere, the defendants,

> GORDON EVANS, a/k/a QB;
>
> PATRICK CAPLE, a/k/a Zoe;
>
> GARY SARTOR, a/k/a G-Stacks, a/k/a Stacks;
>
> TYRONE CLARK, a/k/a Tight Eye;
>
> JOSEPH RILEY, III, a/k/a Joe Blow;
>
> KHAJAVIUS MITCHELL, a/k/a KJ;
>
> TASHIED REED, a/k/a Row, a/k/a Tykune;
>
> MICHAEL JACKSON, a/k/a Self-Made, a/k/a MJ;
>
> BRANDON ASBERRY, a/k/a B5;
>
> JIMMY ROSSER, a/k/a Lil' Jimmy, a/k/a Baby Hazo;
>
> KIERRA MAHEIA, a/k/a Erra;
>
> CETERA BOWLES-GRIFFIN, a/k/a Bella;
>
> ALFONZO NALLS, a/k/a Offset;
>
> RAEKWON WILLIAMS, a/k/a B-Ray; and

each being a person employed by and associated with NTG, an enterprise

engaged in interstate and foreign commerce, and others not named in this

Indictment, did knowingly, willfully and unlawfully combine, conspire,

14

confederate, and agree with one another to violate Title 18, United States Code,

Section 1962(c); that is, to conduct and participate directly and indirectly in the

conduct of the affairs of the enterprise through a pattern of racketeering activity,

as defined by Title 18, United States Code, Sections 1961(1) and (5), which

consisted of multiple threats and acts involving:

      a.     murder, in violation of Official Code of Georgia, Sections 16-5-1; 16-4-1 and 16-4-8;

      b.     robbery, in violation of Official Code of Georgia, Sections 16-8-40; 16-4-1; and 16-4-8; and

      c.     extortion, in violation of Official Code of Georgia, Sections 16-8-16; 16-4-1; and 16-4-8;

multiple offenses involving:

      d.     drug trafficking, in violation of Title 21, United States Code, Sections 841 and 846; and

multiple acts indictable under:

      e.     Title 18, United States Code, Section 1952 (interstate travel in aid of racketeering); and

      f.     Title 18, United States Code, Sections 1512 (tampering with a witness, victim, or informant) and Section 1513 (retaliating against a witness, victim, or informant);

It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

25.     For the purposes of this count, the charged Defendants are only those individuals whose names are listed in all capital letters.

### Manner and Means of the Conspiracy

26.     The manner and means by which the members and associates conducted and participated in the affairs of NTG criminal enterprise to achieve its purposes included, but were not limited to, the following:

a.     The members and associates of the enterprise were required to attend regular meetings, including conference calls, with other NTG gang members to discuss, among other things: structure and organization of the gang; past criminal acts committed against rival gang members and others; NTG members who were arrested or incarcerated; the discipline of NTG members; police interactions with NTG members; the identities of individuals suspected of cooperating with law enforcement and proposed actions to be taken against them; enforcement of gang rules and plans and agreements regarding the commission of future crimes, to include narcotics distribution, robbery, extortion, murder, illegal possession of firearms and assault, as well as ways to conceal these crimes.

b. To enforce discipline and the rules of the enterprise, members and associates of the enterprise engaged in a system of "violations," in which the defendants and others committed, and aided and abetted in the commission of, murder, attempted murder, conspiracy to murder, physical assault and threats, and the imposition of fines for those members and associates of the enterprise who violated rules, questioned authority, were suspected of cooperating with law enforcement, or otherwise posed any real or perceived threat to the leaders, members, or purposes of the enterprise.

c. The members and associates of the enterprise acquired, stored, maintained, borrowed, transferred, carried, circulated, and used a collection of firearms and other weapons for criminal activity by NTG members and associates.

d. The defendants and other members and associates of NTG agreed that acts of violence, including murder, attempted murder and assaults would be committed by members and associates of NTG when it suited the enterprise's purposes, including against its own members. NTG members engaged in acts of intimidation and violence to get respect from those who showed disrespect, to protect the gang, and to enhance its reputation. NTG used direct threats of violence and acts of violence, as well as its reputation for violence, to discourage its members from "snitching" or cooperating with law enforcement.

e.     To generate income, defendants agreed to distribute and attempted to distribute: at least five hundred (500) grams of a mixture and substance containing methamphetamine; a mixture and substance containing heroin; marijuana; Hydrocodone; Alprazolam ("Xanax"); Promethazine Hydrochloride with Codeine; Oxycodone and other illegal substances.

f.     NTG members taught other members and associates how to commit certain crimes, including drug trafficking.

g.     Established NTG members introduced younger members, including juveniles, to the criminal nature of the enterprise by ordering them to commit crimes, including murder, drug trafficking, obstruction, extortion and robbery.

h.     Members and associates of the enterprise used gang-related terminology, codes, symbols, phrases, clothing and hand gestures to demonstrate affiliation with the gang, and, at times, required recruits to memorize the history of the gang and gang rules for membership.

i.     To maintain the enterprise's strict hierarchy and adherence to gang rules and the chain of command, members who refused to follow rules and those believed to be operating without proper authority were severely punished, including by death.

j.     Members and associates of the enterprise hid, misrepresented, concealed, and caused to be hidden, misrepresented, and concealed, the objectives

18

of acts done in furtherance of the enterprise, and used coded language and other means of communication to avoid detection and apprehension by law enforcement authorities.

### Overt Acts

In furtherance of the conspiracy, and to effect the object and purposes thereof, the defendants and others not named as defendants herein committed various overt acts, including, but not limited to, the following:

1.     In or about early 2013, a rift occurred between NTG leadership in Georgia. As a result two NTG lines were created. One line was the "Krook" or "Strong Whip" line named after High O20 Allan Hall, a/k/a "Krook" or "Strong." The other was the "Fire" line, which was named after S.C., a/k/a "Fire."

2.     On or about October 2, 2013, defendant JOSEPH RILEY, Demario Ridley and N.H. possessed firearms, ammunition, digital scales, marijuana, and crack cocaine.

3.     On or about November 13, 2015, defendants KHAJAVIUS MITCHELL and TASHIED REED, along with other NTG members, collaborated to smuggle 22 cell phones, 23 chargers, SIM cards, tobacco and a red bandana into Central State Prison.

4.  In or about November 2015, defendant GORDON EVANS, who was in prison at the time, ordered the killing of Jeffrey Anderson because Anderson owed him $500.

5.  On or about November 24, 2015, fellow NTG members D.L. and D.M. shot and killed Jeffrey Anderson on defendant GORDON EVANS's orders.

6.  After the killing of Jeffrey Anderson, defendant GORDON EVANS told D.M. that EVANS, D.M., and D.L. should talk to get their "stories straight" should police interview them about the murder.

7.  On or about February 13, 2016, defendants TYRONE CLARK, KHAJAVIUS MITCHELL, JOSEPH RILEY, Westly Shivers and JIMMY ROSSER, on the orders of defendant GARY SARTOR, attempted to kill V.P. by shooting him multiple times on the belief that V.P. had disrespected GARY SARTOR by threatening him over a dispute about drugs and money.

8.  On or about February 13, 2016, defendants TYRONE CLARK, KHAJAVIUS MITCHELL, JIMMY ROSSER, and Westly Shivers attended a gang meeting at Adams Park in Atlanta, Georgia.

9.  On or about February 15, 2016, defendants GORDON EVANS, PATRICK CAPLE, GARY SARTOR, and TYRONE CLARK participated in a gang meeting via conference call.  During the call EVANS told the gang's leaders that they "are responsible for the actions of the others underneath you."

10.    On or about February 16, 2016, defendant GORDON EVANS possessed a gang roster, gang literature, and a contraband cell phone in his prison cell.

11.    In or about the Spring of 2016, defendants PATRICK CAPLE, GARY SARTOR, and GORDON EVANS ordered fellow NTG member J.L. to murder the family of D.M. on the belief that D.M. was cooperating with law enforcement regarding Jeffrey Anderson's murder.

12.    On or about June 10, 2016, D.S., A.H., A.A., L.F., T.B., J.C., and D.D. attempted to kill NTG member J.L., on defendants PATRICK CAPLE's and GORDAN EVANS' orders, by slashing J.L's face multiple times and attempting to slit his throat, because J.L. refused to kill D.M.'s family and because he insulted NTG leader defendant GORDON EVANS.

13.    On or about July 11, 2016, defendant KIERRA MAHEIA rented an apartment that members of the enterprise called the "Billy Spot," located at 1033 Hollywood Road Northwest, Apartment P-4 in Atlanta, Georgia, which NTG members used to store and distribute guns and drugs, and as a location to hold gang meetings and conduct other gang activity.

14.    On or about July 14, 2016, defendant RAEKWON WILLIAMS possessed marijuana for distribution.

21

15.     On or about July 15, 2016, defendant TYRONE CLARK paid the Georgia Power bill for the "Billy Spot."

16.     On or about July 19, 2016, defendants KHAJAVIUS MITCHELL, Calmetrius Dawkins and ALFONZO NALLS, possessed firearms and possessed marijuana and prescription medication for distribution.

17.     On or about August 4, 2016, defendant TYRONE CLARK told defendant BRANDON ASBERRY to call NTG leader M.M. regarding acquiring heroin because heroin was M.M. and S.C.'s area of expertise.

18.     On or about August 5, 2016, defendant TYRONE CLARK asked S.C. to help him get in touch with high ranking NTG member M.M. so that M.M. would provide rent money for the "Billy Spot."  S.C. agreed that he would have M.M. send the money.

19.     On or about August 9, 2016, defendant KIERRA MAHEIA paid the rent for the "Billy Spot," via Western Union money order.

20.     On or about August 9, 2016, defendant TYRONE CLARK paid the Scana Energy bill for the "Billy Spot."

21.     On August 13, 2016, CETERA BOWLES-GRIFFIN purchased a kilogram of methamphetamine on behalf of GARY SARTOR for $10,500.

22.    On or about August 13, 2016, defendants KHAJAVIUS MITCHELL,
TASHIED REED, and other NTG members attended a gang meeting at the "Billy
Spot."

23.    On or about August 13 and August 14, 2016, defendants GARY
SARTOR and KHAJAVIUS MITCHELL threatened to kill gang member T.O. for
failing to pay for the marijuana that MITCHELL sold to T.O.

24.    On or about August 14, 2016, NTG member T.O. sent a wire transfer
for $500 via Money Gram to defendant CETERA BOWLES-GRIFFIN.

25.    On or about August 14, 2016, T.O. texted defendant KHAJAVIUS
MITCHELL telling him he had sent the money.

26.    On or about August 15, 2016, defendant JOSEPH RILEY sold
defendant BRANDON ASBERRY drugs on credit.

27.    On or about August 15, 2016, defendant KHAJAVIUS MITCHELL
asked defendant TASHIED REED if he needed a resupply of marijuana, and
REED replied that he still had "a half and three sacks" left.

28.    On or about August 16, 2016, defendant KIERRA MAHEIA made a
cash payment to Georgia Power for the "Billy Spot."

29.    On or about August 17, 2016, defendant TYRONE CLARK
complained to Demario Ridley about marijuana Ridley supplied to CLARK.

23

Ridley responded that he had gotten the marijuana from defendants KHAJAVIUS MITCHELL and CETERA BOWLES-GRIFFIN.

30.    On or about August 22, 2016, defendants TYRONE CLARK and JOSEPH RILEY sold 1000 Xanax pills to Earl Smiley who traveled from South Carolina to Atlanta, GA to make the purchase.

31.    On or about August 24 through on or about August 30, 2016, defendant TYRONE CLARK acquired heroin from a NTG associate that he then sold to NTG member J.W. for distribution.

32.    On or about August 26, 2016, defendants PATRICK CAPLE and GARY SARTOR possessed Xanax and marijuana for distribution.

33.    On or about August 27, 2016, Earl Smiley wired $500 via Western Union to defendant TYRONE CLARK to pay a portion of a drug debt Smiley owed CLARK.

34.    On or about August 27, 2016, Earl Smiley sent his full name to defendant TYRONE CLARK so that CLARK could pick up the Western Union transfer Smiley sent to him.

35.    On or about August 27, 2016, defendants TYRONE CLARK, KHAJAVIUS MITCHELL, BRANDON ASBERRY, and RAEKWON WILLIAMS, along with fellow NTG members J'mon Hawkins, Calmetrius Dawkins (not defendants in this count) and others, attended a gang meeting at the "Billy Spot."

36.     On September 5, 2016, Marcus Russell was found to be in possession of a loaded nine millimeter pistol during a traffic stop in Jessup, GA.  Russell abandoned the weapon and fled from the police.

37.     On or about September 8, 2016, defendants TYRONE CLARK and JOSEPH RILEY, along with Demario Ridley, possessed Xanax pills for distribution.

38.     On or about September 8, 2016, defendants KHAJAVIUS MITCHELL, CETERA BOWLES-GRIFFIN, and MICHAEL JACKSON discussed how to re-package the two-quarter pound packages of marijuana BOWLES-GRIFFIN had received from defendant JOSEPH RILEY so they could be sent to JACKSON, who was incarcerated at Dodge State Prison.

39.     By at least September 8, 2016, KHAJAVIUS MITCHELL had provided high quality marijuana to J'mon Hawkins on credit.

40.     On or about September 8, 2016, defendant KHAJAVIUS MITCHELL complained to defendant JIMMY ROSSER that ROSSER was not selling marijuana quickly enough.

41.     On or about September 8, 2016, defendant KHAJAVIUS MITCHELL agreed to sell Marcus Russell a half-pound of marijuana.

42.     On or about September 8, 2016, defendants TYRONE CLARK and BRANDON ASBERRY participated in a phone call where the need to collect

25

members' dues money was emphasized because M.M. had to send money "up top," out of his own pocket and it was communicated by M.M. that those who did not pay would be disciplined.

43.    On or about September 9, 2016, higher ranking NTG member M.M. advised defendant TYRONE CLARK to kill Earl Smiley for his failure to pay TYRONE CLARK for the Xanax pills CLARK supplied Smiley.  M.M. offered to supply CLARK with a gun or to arrange for the killing by a lower-ranking NTG member.

44.    On or about September 9, 2016, defendant TYRONE CLARK discussed tasking defendant KHAJAVIUS MITCHELL with killing Earl Smiley for his failure to pay his drug debt and MITCHELL stated that he would be willing to carry out the murder.

45.    On or about September 9, 2016, defendants TYRONE CLARK, KHAJAVIUS MITCHELL and other NTG members participated in a gang meeting via telephone.

46.    On or about September 9, 2016, defendants GARY SARTOR and KHAJAVIUS MITCHELL arranged to provide Tremaine Garrison, who was incarcerated at the time, with two ounces of marijuana.  Garrison sent Sheena Brown to pick up the marijuana from MITCHELL and deliver it to Garrison.

47. On or about September 9, 2016, defendant KHAJAVIUS MITCHELL threatened to kill gang member T.O. for failing to repay his drug debt.

48. On or about September 10, 2016, defendant CETERA BOWLES-GRIFFIN received a wire transfer payment from gang member T.O. to partially pay the debt he owed KHAJAVIUS MITCHELL.

49. On or about September 10, 2016, defendant CETERA BOWLES-GRIFFIN received a wire transfer payment via Money Gram from Sheena Brown for marijuana sales to Tremaine Garrison.

50. On or about September 10, 2016, KHAJAVIUS MITCHELL sold defendant BRANDON ASBERRY Xanax pills.

51. On or about September 11, 2016, defendant KHAJAVIUS MITCHELL ordered defendant KIERRA MAHEIA and other NTG members to remove his drugs from the "Billy Spot," before police arrived after J'mon Hawkins shot himself in the foot.

52. On or about September 11, 2016, defendant KIERRA MAHEIA told defendant KHAJAVIUS MITCHELL that she had "everything" in her hands but she did not have access to a vehicle. MITCHELL called defendant BOWLES-GRIFFIN and instructed her to go pick MAHEIA up.

53. On or about September 13, 2016, KHAJAVIUS MITCHELL and JIMMY ROSSER sold Xanax pills to an unknown buyer.

27

54.    Beginning on or about September 15, 2016, and continuing through on or about September 17, 2016, defendants KHAJAVIUS MITCHELL and CETERA BOWLES-GRIFFIN picked up over $16,000 from Marcus Russell. MITCHELL and defendant GARY SARTOR then instructed BOWLES-GRIFFIN to pick up marijuana and methamphetamine from SARTOR's drug suppliers. BOWLES-GRIFFIN then delivered the drugs to Russell.

55.    On or about September 15, 2016, defendant KHAJAVIUS MITCHELL supplied defendant JIMMY ROSSER with marijuana for further distribution.

56.    On or about September 15, 2016, defendant TYRONE CLARK sent a text to Earl Smiley regarding Smiley's unpaid drug debt to CLARK stating "this is not the Billy way."

57.    On or about September 16, 2016, defendant TYRONE CLARK obtained drugs for distribution from Travis Todd and Demario Ridley (not defendants in this count).

58.    On or about September 17, 2016, defendant KHAJAVIUS MITCHELL sold a stolen Glock firearm to Marcus Russell to replace the gun that police seized from Russell a few weeks earlier.

59.    On or about September 17, 2016, defendant KHAJAVIUS MITCHELL sold marijuana on credit to Calmetrius Dawkins.

28

60.     On or about September 17, 2016, defendant KHAJAVIUS MITCHELL and J'mon Hawkins sold marijuana to an unknown buyer.

61.     On or about September 17, 2016, defendant KHAJAVIUS MITCHELL distributed marijuana to defendant MICHAEL JACKSON, a defendant at Dodge State Prison, and others.

62.     On or about September 18, 2016, Marcus Russell complained in a text message to defendant GARY SARTOR that one of the pounds of marijuana he received from SARTOR was short four ounces.

63.     On or about September 19, 2016, defendant KHAJAVIUS MITCHELL bought high-grade marijuana from his supplier, A.K.

64.     On or about September 19, 2016, defendants KHAJAVIUS MITCHELL and CETERA BOWLES-GRIFFIN delivered marijuana to defendant JIMMY ROSSER.

65.     On or about September 19, 2016, defendant KHAJAVIUS MITCHELL sold Xanax pills to J'mon Hawkins.

66.     On or about September 19, 2016, defendant TASHIED REED possessed a .380 handgun.

67.     On or about September 19, 2016, defendants JOSEPH RILEY, TYRONE CLARK, KHAJAVIUS MITCHELL, and other NTG members discussed

participating in a drive-by shooting for money. MITCHELL and another NTG member agreed to do the drive-by shooting.

68. On or about September 20, 2016, defendant KHAJAVIUS MITCHELL provided Calmetrius Dawkins with marijuana intended for distribution.

69. On or about September 20, 2016, defendants KHAJAVIUS MITCHELL and CETERA BOWLES-GRIFFIN sold defendant MICHAEL JACKSON, an inmate at Dodge State Prison, $1,800 worth of marijuana.

70. On or about September 20, 2016, defendants GARY SARTOR and KHAJAVIUS MITCHELL sold defendant MICHAEL JACKSON two ounces of methamphetamine.

71. On or about September 20, 2016, Calmetrius Dawkins possessed marijuana packaged for distribution that he had obtained from defendant KHAJAVIUS MITCHELL along with a loaded firearm.

72. On or about September 21, 2016, Calmetrius Dawkins called defendant KHAJAVIUS MITCHELL and told MITCHELL that Dawkins had been arrested with 9 bags of marijuana but that Dawkins would still arrange to pay MITCHELL the money Dawkins owed MITCHELL for the drugs.

73.    On or about September 21, 2016, defendant MICHAEL JACKSON, an inmate at Dodge State prison, sent a wire transfer of $485.20 to CETERA BOWLES-GRIFFIN via PayPal.

74.    On or about September 21, 2016, defendant CETERA BOWLES-GRIFFIN texted defendant GARY SARTOR that she had received $500 from defendant MICHAEL JACKSON, an inmate at Dodge State Prison, as payment for methamphetamine that SARTOR was providing JACKSON through BOWLES-GRIFFIN.

75.    On or about September 21, 2016, defendant KHAJAVIUS MITCHELL bought two ounces of marijuana from A.K.

76.    On or about September 21, 2016, defendant RAEKWON WILLIAMS possessed marijuana for distribution.

77.    On or about September 21, 2016, defendant KHAJAVIUS MITCHELL checked on defendant RAEKWON WILLIAMS's drug supply and MITCHELL refused to sell any more Xanax to WILLIAMS until he paid the money he owed MITCHELL.

78.    On or about September 22, 2016, defendant TYRONE CLARK sold oxycodone pills.

31

79.     On or about September 22, 2016, S.C. called defendant KHAJAVIUS
MITCHELL to inquire about purchasing marijuana from MITCHELL's
connection, A.K.

80.     On or about September 22, 2016, defendant KHAJAVIUS
MITCHELL sold marijuana to other NTG members.

81.     On or about September 22, 2016, defendants KHAJAVIUS
MITCHELL and GARY SARTOR, and S.C. discussed the pricing for
methamphetamine that S.C. was planning to distribute in NY.

82.     On or about September 22, 2016, S.C. told defendant TYRONE
CLARK that he was going to New Jersey to get in good standing with NTG
Godfather P.G.  S.C. also asked CLARK about the appropriate price for
methamphetamine that S.C. was planning to distribute while in the New
Jersey/NewYork area.

83.     On or about September 23, 2016, defendant KHAJAVIUS
MITCHELL sold marijuana to defendant JIMMY ROSSER.

84.     On or about September 23, 2016, defendant KHAJAVIUS
MITCHELL obtained marijuana from his supplier, A.K. for himself, defendant
GARY SARTOR, and S.C.

85.     On or about September 23, 2016, defendant RAEKWON WILLIAMS
told defendant KHAJAVIUS MITCHELL that he still had 3 ounces of marijuana

left to sell, but that he had a sum of money he owed to MITCHELL, to which MITCHELL said he would send defendant CETERA BOWLES-GRIFFIN to pick up the money.

86.     On or about September 24, 2016, defendants KHAJAVIUS MITCHELL and CETERA BOWLES-GRIFFIN sold marijuana to S.C. for further distribution.

87.     On or about September 24, 2016, defendants TYRONE CLARK, KHAJAVIUS MITCHELL, JOSEPH RILEY, RAEKWON WILLIAMS, KIERRA MAHEIA, ALFONZO NALLS, BRANDON ASBERRY, TASHIED REED, JIMMY ROSSER, and other NTG members, attended a gang meeting at the "Billy Spot."

88.     On or about September 24, 2016, NTG member Y.G. stole $5000 from the residence of defendants KHAJAVIUS MITCHELL and CETERA BOWLES-GRIFFIN.

89.     On or about September 24, 2016, on the orders of defendant KHAJAVIUS MITCHELL, defendant CETERA BOWLES-GRIFFIN removed all of the firearms and drugs from MITCHELL and BOWLES-GRIFFIN's residence.

90.     On or about September 25, 2016, defendants KHAJAVIUS MITCHELL and RAEKWON WILLIAMS possessed firearms and agreed to kill Y.G. in retaliation for stealing money from defendant KHAJAVIUS MITCHELL.

33

91.     On or about September 25 and 26, 2016, after the arrest of defendants KHAJAVIUS MITCHELL and RAEKWON WILLIAMS, defendants GARY SARTOR, TYRONE CLARK, ALFONZO NALLS, and KIERRA MAHEIA collaborated to remove all contraband, including drugs and drug proceeds, from the "Billy Spot," to avoid detection and confiscation of the drugs and money by law enforcement.

92.     On or about September 26, 2016, defendant KIERRA MAHEIA, in an attempt to hide the information from law enforcement, deleted evidence of gang activity from the Facebook account of defendant KHAJAVIUS MITCHELL.

93.     On or about September 26, 2016, defendant TASHIED REED traveled to the Mechanicsville neighborhood in Atlanta, GA, to confront members of the Good Fellas gang who REED believed were in possession of the $5,000 that Y.G. had taken from defendant KHAJAVIUS MITCHELL.

94.     On or about September 26, 2016, TASHIED REED called the gang's leadership to request aid and assistance from fellow NTG members because Good Fellas gang members had pulled firearms on him.

95.     On or about September 26, 2016, JOSEPH RILEY, TYRONE CLARK, and MICHAEL JACKSON arranged for CETERA BOWLES-GRIFFIN, BRANDON ASBERRY, J'mon Hawkins, ALFONZO NALLS, Wajzim Reed, NTG associate A.A. and others to meet up with defendant TASHIED REED with the

intent of going back to the Good Fella gang members' house to recover
KHAJAVIUS MITCHELL's money taken by Y.G. and kill the persons who
pointed firearms at REED earlier in the day.

96.    On or about September 26, 2016, defendant ALFONZO NALLS
provided defendant CETERA BOWLES-GRIFFIN with an assault rifle to be used
to kill the persons who pointed firearms at defendant TASHIED REED.

97.    On or about September 26, 2016, defendants TASHIED REED,
CETERA BOWLES-GRIFFIN, BRANDON ASBERRY, Wajzim Reed, and A.A.
possessed firearms.

98.    On or about September 26, 2016, defendant GARY SARTOR ordered
the murder of NTG member D.H. by sending a text message to defendant
JOSEPH RILEY and other NTG members and associates telling them that D.H.
was a "plate," and was "greenlighted" because D.H. deceived a Bloods gang
member.

99.    On or about September 26, 2016, defendant GARY SARTOR
confirmed to defendant TYRONE CLARK that he ordered the murder of D.H.

100.    On or about September 27, 2016, defendant JIMMY ROSSER
possessed a loaded pistol.

101.    On or about September 27, 2016, defendants MICHAEL JACKSON and TYRONE CLARK discussed having narcotics delivered to a correction officer at Dodge State Prison.

102.    On or about October 1, 2016, defendant TYRONE CLARK, and Cedrick Hill and Erick Balcazar (not defendants in this count) supplied defendants GARY SARTOR and JOSEPH RILEY with methamphetamine for distribution.

103.    In or about October 2016, defendants GARY SARTOR and JOSEPH RILEY possessed methamphetamine for distribution.

104.    On or about October 3, 2016, S.C. told defendant TYRONE CLARK that he had just gotten off the phone with NTG Godfather P.G.

105.    On or about October 3, 2016, S.C. sold defendant TYRONE CLARK the marijuana that S.C. had previously purchased from defendant KHAJAVIUS MITCHELL as S.C. had been unable to sell it.

106.    On or about October 4, 2016, defendant TYRONE CLARK sold Percocet and marijuana to Blood member C.H. for distribution.

107.    On or about October 5, 2016, an inmate at Smith State Prison contacted defendant TYRONE CLARK to vet an NTG gang member.

108.    On or about October 5, 2016, after defendant KHAJAVIUS MITCHELL had been arrested, S.C. and defendant TYRONE CLARK discussed

introducing MITCHELL's marijuana supplier, A.K., to S.C. for the purpose of continuing A.K.'s supply of marijuana to members of the gang.

109.   On or about October 6, 2016, defendant KIERRA MAHEIA paid rent for the "Billy Spot," via Western Union money order.

110.   On or about October 18, 2016, defendant KIERRA MAHEIA paid rent for the "Billy Spot," via Western Union money order.

111.   On or about October 18, 2016, defendant RAEKWON WILLIAMS filed a fraudulent affidavit in Fulton County Superior Court claiming that defendant KHAJAVIUS MITCHELL was unaware that narcotics or guns were in the vehicle WILLIAMS and MITCHELL were traveling in during a September 25, 2016 traffic stop.

112.   On or about November 1, 2016, defendant JOSEPH RILEY and Demario Ridley possessed marijuana for distribution.

113.   On or about and between November 1 through November 3, 2016, defendants GARY SARTOR, MICHAEL JACKSON, an inmate at Dodge State Prison, JOSEPH RILEY, and an associate obtained methamphetamine and marijuana, which they then packaged so that it could be smuggled into Dodge State Prison by corrections officer Fred Arceneaux.

114.    On or about November 4, 2016, defendant GARY SARTOR, sent NTG member C.M. to Jessup, GA to pick-up approximately $38,000 from Marcus Russell for the purchase of methamphetamine and marijuana.

115.    On or about November 4, 2016, defendants GARY SARTOR, and JOSEPH RILEY supplied Monique Preston with methamphetamine and marijuana on behalf of defendant MICHAEL JACKSON, an inmate at Dodge State Prison. JACKSON had purchased the drugs from SARTOR. Preston and another individual associated with JACKSON then delivered the drugs to Dodge State Prison corrections officer Fred Arceneaux.

116.    On or about November 4, 2016, defendant TYRONE CLARK, and Cedrick Hill and Erick Balcazar provided four kilograms of methamphetamine to defendant JOSEPH RILEY on behalf of defendant GARY SARTOR.

117.    On or about November 4, 2016, defendants JOSEPH RILEY and GARY SARTOR, and Demario Ridley provided Sheena Brown with methamphetamine and marijuana on behalf of Tremaine Garrison who was incarcerated at the time.

118.    On or about November 4, 2016, defendant TYRONE CLARK possessed a .45 caliber pistol and $5,538 cash.

119.    On or about November 4, 2016, PATRICK CAPLE orchestrated sending money to JOSEPH RILEY via Western Union transfers to pay for Xanax.

120.    On or about and between November 4, 2016 and November 5, 2016, defendants PATRICK CAPLE and JOSEPH RILEY, and Travis Todd possessed Xanax for distribution.

121.    On or about November 5, 2016, Fred Arceneaux, in his role as a corrections officer, attempted to smuggle methamphetamine and marijuana into Dodge State Prison.

122.    On or about November 5, 2016, defendants GARY SARTOR and JOSEPH RILEY, and Travis Todd provided NTG member C.M. with marijuana and methamphetamine for delivery to Marcus Russell.

123.    On or about November 6, 2016, defendants GARY SARTOR and JOSEPH RILEY, and Erick Balcazar and Cedrick Hill provided Monique Preston with methamphetamine, for delivery to Marcus Russell.

124.    On or about November 7, 2016, defendant JOSEPH RILEY and Travis Todd possessed Xanax for distribution.

125.    On or about November 12, 2016, defendants JOSEPH RILEY, RAEKWON WILLAMS, and TASHIED REED, and other NTG members attended a gang meeting.

126.    On or about November 14 and 15, 2016, defendant JOSEPH RILEY purchased a truck in exchange for Xanax pills, marijuana, and $1,350 in cash.

127.    On or about November 16, 2016, defendant JOSEPH RILEY and Demario Ridley sold J'mon Hawkins Xanax for distribution.

128.    On or about November 19, 2016, defendants GARY SARTOR, CETERA BOWLES-GRIFFIN and JOSEPH RILEY, and Linnie Andrews provided Sheena Brown with methamphetamine on behalf of Tremaine Garrison. Brown then attempted to deliver the methamphetamine to Garrison who was in prison at the time.

129.    On or about November 21, 2016, defendant GARY SARTOR had a discussion with Linnie Andrews about the route Sheena Brown was supposed to have taken to deliver methamphetamine, and Andrews assisted SARTOR in looking up whether Andrews had been arrested.

130.    On or about November 25, 2016, defendants GARY SARTOR and JOSEPH RILEY, provided J.J. and Adrian Ansley with methamphetamine for delivery to Marcus Russell.

131.    On or about November 25, 2016, while in possession of firearms, defendant TASHIED REED and NTG member A.F. traveled to South Carolina to collect a drug debt owed to defendant TYRONE CLARK from Earl Smiley.

## Notice of Enhanced Sentencing

132.    The following defendants joined and remained in the RICO conspiracy

charged in Count One knowing and agreeing that members of the enterprise

would engage in acts involving murder, in violation of Official Code of Georgia

16-5-1, that is unlawfully and with malice aforethought, either express or

implied, causes the death of another human being:

> GARY SARTOR, a/k/a G-Stacks, a/k/a Stacks;
>
> PATRICK CAPLE, a/k/a Zoe;
>
> GORDON EVANS, a/k/a QB;
>
> TYRONE CLARK, a/k/a Tight Eye;
>
> JOSEPH RILEY, III, a/k/a Joe Blow;
>
> KHAJAVIUS MITCHELL, a/k/a KJ;
>
> TASHIED REED, a/k/a Row;
>
> MICHAEL JACKSON, a/k/a MJ;
>
> BRANDON ASBERRY, a/k/a B5;
>
> JIMMY ROSSER, a/k/a Lil' Jimmy, a/k/a Baby Hazo;
>
> CETERA BOWLES-GRIFFIN, a/k/a Bella;
>
> ALFONZO NALLS, a/k/a Offset; and
>
> RAEKWON WILLIAMS, a/k/a B-Ray

133.    The following defendants joined and remained in the RICO conspiracy

charged in Count One knowing and agreeing that members of the enterprise

would manufacture, distribute, and possess with the intent to distribute

41

controlled substances including more than 500 grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance in violation of Title 21, United States Code, Section 841, Section 841(b)(1)(A), and Section 846:

> GARY SARTOR, a/k/a G-Stacks, a/k/a Stacks;
>
> TYRONE CLARK, a/k/a Tight Eye;
>
> JOSEPH RILEY, III, a/k/a Joe Blow;
>
> KHAJAVIUS MITCHELL, a/k/a KJ;
>
> MICHAEL JACKSON, a/k/a Self-Made, a/k/a MJ and
>
> CETERA BOWLES-GRIFFIN, a/k/a Bella

All in violation of Title 18, United States Code, Sections 1962(d) and 1963(a).

### Count 2 (Attempted VICAR Murder – V.P.)

1.      At all times relevant to this Indictment, NTG, as more fully described in Paragraphs 1 – 24 of Count One of this Indictment, which are realleged and incorporated by reference herein, including its leaders, members and associates, constituted an enterprise as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that was engaged in, and the activities of which affected, interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a

continuing unit for a common purpose of achieving the objectives of the enterprise.

2.    At all times relevant to this Indictment, the above-described enterprise, NTG, through its members and associates, engaged in racketeering activity as defined in Title 18, United States Code, Section 1959(b)(1) and Section 1961(1), that is, acts involving murder, in violation of the laws of the State of Georgia; multiple offenses involving Title 21, United States Code, Section 841 and 846; and acts indictable under Title 18, United States Code, Sections 1512 and 1513.

3.    On or about February 13, 2016, in the Northern District of Georgia, defendants TYRONE CLARK, KHAJAVIUS MITCHELL, JOSEPH RILEY, GARY SARTOR, JIMMY ROSSER, and WESTLY SHIVERS aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and unlawfully attempt to murder V.P., in violation of Official Code of Georgia, Section 15-5-1(a) (murder) and Section 16-4-1 (attempt), for the purpose of maintaining and increasing position in NTG, an enterprise engaged in racketeering activity.

All in violation of Title 18, United States Code, Sections 1959(a)(5) and 2.

## Count 3 (VICAR Murder Conspiracy V.P.)

1.    Paragraphs 1 and 2 of Count 2 of this Indictment are re-alleged and incorporated by reference as though set forth fully herein.

43

2.  On or about February 12 and 13, 2016, in the Northern District of Georgia, the defendants, TYRONE CLARK, KHAJAVIUS MITCHELL, JOSEPH RILEY, GARY SARTOR, JIMMY ROSSER, and WESTLY SHIVERS, for the purpose of maintaining and increasing position in NTG, an enterprise engaged in racketeering activity, did intentionally and knowingly conspire to murder V.P. in violation of Official Code of Georgia, Sections 15-5-1(a) (murder) and 16-4-8 (conspiracy).  All in violation of Title 18, United States Code, Section 1959(a)(5).

### Count 4 (VICAR Conspiracy D.M. Family Members)

1.  Paragraphs 1 and 2 of Count 2 of this Indictment are re-alleged and incorporated by reference as though set forth fully herein.

2.  In or about the Spring of 2016, in the Northern District of Georgia, the defendants, PATRICK CAPLE, GARY SARTOR, and GORDON EVANS, for the purpose of maintaining and increasing position in NTG, an enterprise engaged in racketeering activity, did intentionally and knowingly conspire to murder the family members of D.M.  in violation of Official Code of Georgia, Section 15-5-1(a) (murder) and Section 16-4-8 (conspiracy).

All in violation of Title 18, United States Code, Section 1959(a)(5).

### Count 5 (VICAR Murder Conspiracy J.L.)

1.  Paragraphs 1 and 2 of Count 2 of this Indictment are re-alleged and incorporated by reference as though set forth fully herein.

44

2.   On or about June 10, 2016, in the Northern District of Georgia, defendants PATRICK CAPLE and GORDON EVANS, for the purpose of maintaining and increasing position in NTG, an enterprise engaged in racketeering activity, did intentionally and knowingly conspire to murder J.L. in violation of Official Code of Georgia, Section 15-5-1(a) (murder) and Section 16-4-8 (conspiracy).

All in violation of Title 18, United States Code, Section 1959(a)(5).

### Count 6 (VICAR Murder Conspiracy Y.G.)

1.     Paragraphs 1 and 2 of Count 2 of this Indictment are re-alleged and incorporated by reference as though set forth fully herein.

2.     In or about September 25, 2016, in the Northern District of Georgia, defendants KHAJAVIUS MITCHELL and RAEKWON WILLIAMS, for the purpose of maintaining and increasing position in NTG, an enterprise engaged in racketeering activity, did intentionally and knowingly conspire to murder Y.G. in violation of Official Code of Georgia, Section 15-5-1(a) (murder) and Section 16-4-8 (conspiracy).

All in violation of Title 18, United States Code, Section 1959(a)(5).

### Count 7 (VICAR Murder Conspiracy Good Fellas Gang Members)

1.   Paragraphs 1 and 2 of Count 2 of this Indictment are re-alleged and incorporated by reference as though set forth fully herein.

45

2.  In or about September 26, 2016, defendants TASHIED REED,

CETERA BOWLES-GRIFFIN, BRANDON ASBERRY, ALFONZO NALLS,

WAJZIM REED, TYRONE CLARK, MICHAEL JACKSON and JOSEPH RILEY,

for the purpose of maintaining and increasing position in NTG, an enterprise

engaged in racketeering activity, did intentionally and knowingly conspire to

murder Good Fellas gang members in violation of Official Code of Georgia,

Section 15-5-1(a) (murder) and Section 16-4-8 (conspiracy).

All in violation of Title 18, United States Code, Section 1959(a)(5).

### Count 8 (846 Conspiracy)

Beginning on a date unknown to the Grand Jury, but at least in or about

2016, and continuing until on or about the date of this Indictment, in the

Northern District of Georgia and elsewhere, the defendants:

> LINNIE ANDREWS;
> ADRIAN ANSLEY;
> FRED ARCENEAUX;
> BRANDON ASBERRY, a/k/a B5;
> ERICK BALCAZAR;
> CETERA BOWLES-GRIFFIN, a/k/a Bella;
> SHEENA BROWN;
> PATRICK CAPLE, a/k/a Zoe;
> TYRONE CLARK, a/k/a Tight Eye;
> CALMETRIUS DAWKINS, a/k/a Ballyo;
> TREMAINE GARRISON, a/k/a Paperwork;
> J'MON HAWKINS, a/k/a Monto Pronto;
> CEDRICK HILL, a/k/a Ced;
> MICHAEL JACKSON, a/k/a MJ, a/k/a Self-Made;
> KHAJAVIUS MITCHELL, a/k/a KJ;
> MONIQUE PRESTON;

TASHIED REED, a/k/a Row, a/k/a Tykune;
JOSEPH RILEY, a/k/a Joe Blow;
JIMMY ROSSER, a/k/a Lil' Jimmy aka Baby Hazo;
MARCUS RUSSELL, a/k/a Double M;
GARY SARTOR, a/k/a G-Stacks, a/k/a Stacks;
EARL SMILEY;
TRAVIS TODD, a/k/a T-Raw;
DEMARIO RIDLEY, a/k/a Lil Yo; and
RAEKWON WILLIAMS, a/k/a B-Ray

did knowingly and intentionally combine, conspire, confederate, agree, and have

a tacit understanding with each other and other persons known and unknown to

the Grand Jury, to violate Title 21, United States Code, Section 841(a)(1); that is,

to knowingly and intentionally distribute and possess with intent to distribute a

controlled substance, said conspiracy involving: (1) at least five hundred (500)

grams of a mixture and substance containing a detectable amount of

methamphetamine, a Schedule II controlled substance, (2) marijuana, a Schedule

I controlled substance, (3) Hydrocodone, a Schedule II controlled substance, (4)

Alprazolam ("Xanax"), a Schedule IV controlled substance, (5) Promethazine

Hydrochloride with Codeine, a Schedule V controlled substance, and (6) a

mixture and substance containing a detectable amount of heroin, a Schedule I

controlled substance, all in violation of Title 21, United States Code, Sections 846;

Section 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), 841(b)(1)(D), 841(b)(2) and 841(b)(3).

## Count 9 (Possession of Marijuana with Intent to Distribute)

On or about September 20, 2016, in the Northern District of Georgia and elsewhere, the defendants:

> KHAJAVIUS MITCHELL, a/k/a KJ; and
> CALMETRIUS DAWKINS, a/k/a Ballyo

aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and intentionally possess with the intent to distribute a controlled substance, said act involving marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D), and Title 18, United States Code, Section 2.

## Count 10 (Possession of Marijuana with Intent to Distribute)

On or about September 25, 2016, in the Northern District of Georgia and elsewhere, the defendants:

> KHAJAVIUS MITCHELL, a/k/a KJ; and
> RAEKWON WILLIAMS, a/k/a B-Ray

aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and intentionally possess with the intent to distribute a controlled substance, said act involving marijuana, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(D), and Title 18, United States Code, Section 2.

48

## Count 11 (Possession of Marijuana and Methamphetamine with Intent to Distribute)

On or about November 4, 2016, and continuing until on or about

November 5, 2016, in the Northern District of Georgia and elsewhere, the

defendants:

GARY SARTOR, a/k/a G-Stacks, a/k/a Stacks;
JOSEPH RILEY, a/k/a Joe Blow;
MICHAEL JACKSON, a/k/a MJ, a/k/a Self-Made;
FRED ARCENEAUX; and
MONIQUE PRESTON

aided and abetted by each other and others known and unknown to the Grand

Jury, did knowingly and intentionally distribute and possess with the intent to

distribute a controlled substance, said act involving: (1) marijuana, a Schedule I

controlled substance, and (2) at least fifty (50) grams of a mixture and substance

containing a detectable amount of methamphetamine, a Schedule II controlled

substance, in violation of Title 21, United States Code, Sections 841(a)(1),

841(b)(1)(B), and 841(b)(1)(D) and Title 18, United States Code, Section 2.

## Count 12 (Possession of Methamphetamine with Intent to Distribute)

On or about November 4, 2016, and continuing until on or about

November 6, 2016, in the Northern District of Georgia and elsewhere, the

defendants:

TYRONE CLARK, a/k/a Tight Eye;
ERICK BALCAZAR; and
CEDRICK HILL

49

aided and abetted by each other and others known and unknown to the Grand

Jury, did knowingly and intentionally possess with the intent to distribute a

controlled substance, said act involving at least five hundred (500) grams of a

mixture and substance containing a detectable amount of methamphetamine, a

Schedule II controlled substance, all in violation of Title 21, United States Code,

Sections 841(a)(1) and 841(b)(1)(A), and Title 18, United States Code, Section 2.

### Count 13 (Possession of Marijuana and Methamphetamine with Intent to Distribute)

On or about November 4, 2016, and continuing until on or about

November 6, 2016, in the Northern District of Georgia and elsewhere, the

defendants:

> GARY SARTOR, a/k/a G-Stacks, a/k/a Stacks;
> JOSEPH RILEY, a/k/a Joe Blow;
> MARCUS RUSSELL, a/k/a Double M;
> DEMARIO RIDLEY, a/k/a Lil' Yo; and
> TRAVIS TODD, a/k/a T-Raw

aided and abetted by each other and others known and unknown to the Grand

Jury, did knowingly and intentionally possess with the intent to distribute a

controlled substance, said act involving: (1) marijuana, a Schedule I controlled

substance, and (2) at least five hundred (500) grams of a mixture and substance

containing a detectable amount of methamphetamine, a Schedule II controlled

substance, all in violation of Title 21, United States Code, Sections 841(a)(1),

841(b)(1)(A) and 841(b)(1)(D), and Title 18, United States Code, Section 2.

### Count 14 (Possession of Methamphetamine with Intent to Distribute)

On or about November 6, 2016, in the Northern District of Georgia and

elsewhere, the defendant:

MONIQUE PRESTON

aided and abetted by others known and unknown to the Grand Jury, did

knowingly and intentionally possess with the intent to distribute a controlled

substance, said act involving at least five hundred (500) grams of a mixture and

substance containing a detectable amount of methamphetamine, a Schedule II

controlled substance, in violation of Title 21, United States Code, Sections

841(a)(1) and 841(b)(1)(A), and Title 18, United States Code, Section 2.

### Count 15 (Possession of Methamphetamine with Intent to Distribute)

On or about November 19, 2016, and continuing until on or about

November 25, 2016, in the Northern District of Georgia and elsewhere, the

defendants:

GARY SARTOR, a/k/a G-Stacks, a/k/a Stacks;
JOSEPH RILEY, a/k/a Joe Blow;
CETERA BOWLES-GRIFFIN, a/k/a Bella; and
LINNIE ANDREWS;

aided and abetted by each other and others known and unknown to the Grand

Jury, did knowingly and intentionally possess with the intent to distribute a

controlled substance, said act involving at least five hundred (500) grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A), and Title 18, United States Code, Section 2.

### Count 16 (Possession of Methamphetamine with Intent to Distribute)

On or about November 19, 2016, in the Northern District of Georgia and elsewhere, the defendants:

SHEENA BROWN; and
TREMAINE GARRISON, a/k/a Paperwork

aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and intentionally possess with the intent to distribute a controlled substance, said act involving at least fifty (50) grams of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B), and Title 18, United States Code, Section 2.

### Count 17 (Possession of Methamphetamine with Intent to Distribute)

On or about November 25, 2016, in the Northern District of Georgia and elsewhere, the defendants:

MARCUS RUSSELL, a/k/a Double M; and
ADRIAN ANSLEY

aided and abetted by each other and others known and unknown to the Grand

Jury, did knowingly and intentionally possess with the intent to distribute a

controlled substance, said act involving at least five hundred (500) grams of a

mixture and substance containing a detectable amount of methamphetamine, a

Schedule II controlled substance, in violation of Title 21, United States Code,

Sections 841(a)(1) and 841(b)(1)(A), and Title 18, United States Code, Section 2.

### Count 18 (18 U.S.C. 924(c))

On or about September 25, 2016, in the Northern District of Georgia, the

defendant, RAEKWON WILLIAMS, a/k/a B-Ray, knowingly possessed a

firearm, that is, a Taurus 709 Slim 9mm pistol, in furtherance of a drug trafficking

crime as set forth in Counts 1 and 10 of this Indictment, all in violation of Title 18,

United States Code, Section 924(c)(1)(A) and Section 2.

### Count 19 (18 U.S.C. 924 (c))

On or about September 25, 2016, in the Northern District of Georgia, the

defendant, KHAJAVIUS MITCHELL, a/k/a KJ, knowingly possessed a firearm,

that is, a Glock 27, .40 caliber pistol, in furtherance of a drug trafficking crime for

which he may be prosecuted in a court of the United States, that is, Title 21,

United States Code, Sections 846 and 841, as set forth in Counts One and 11 of

this Indictment, all in violation of Title 18, United States Code, Section

924(c)(1)(A) and Section 2.

## Count 20 (Maintaining drug-involved premises)

Beginning on or about July 11, 2016, and continuing until on or about the date of this Indictment, within the Northern District of Georgia, the defendants KIERRA MAHEIA, a/k/a Erra and KHAJAVIUS MITCHELL, a/k/a KJ, aided and abetted by each other and others known and unknown to the Grand Jury, did knowingly and intentionally open, lease, rent, use and maintain an apartment, located at 1033 Hollywood Road, Apt. P4, Atlanta, Georgia, for the purpose of distributing controlled substances, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(D), 841(b)(2), and 846, all in violation of Title 21, United States Code, Section 856(a)(1) and Title 18, United States Code, Section 2.

## Count 21 (Felon in Possession of a Firearm)

On or about September 27, 2016, in the Northern District of Georgia, the defendant, JIMMY ROSSER, having been convicted of Burglary, on or about August 25, 2011, in Georgia, the aforesaid conviction being for a crime punishable by imprisonment for a term exceeding one year, did knowingly possess, in and affecting interstate and foreign commerce, the following firearm: a Ruger model P95, 9mm pistol, in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2).

## Count 22 (Interstate Travel in Aid of Racketeering)

On or about August 22, 2016, in the Northern District of Georgia and elsewhere, the defendant, EARL SMILEY, traveled in interstate commerce from the State of South Carolina to the State of Georgia, with intent to promote, manage, establish, carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is, distribution and possession with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 841 and 846, and thereafter performed and attempted to perform an act to promote, manage, establish and carry on and facilitate the promotion, management, establishment and carrying on, of such unlawful activity, all in violation of Title 18, United States Code, Sections 1952(a)(3) and Title 18, United States Code, Section 2.

### FORFEITURE PROVISIONS

Upon conviction of the offense in violation of Title 18, United States Code, Section 1962 alleged in Count One of this Indictment, the defendants, GORDON EVANS, a/k/a QB; PATRICK CAPLE, a/k/a Zoe; GARY SARTOR, a/k/a G-Stacks, a/k/a Stacks; TYRONE CLARK, a/k/a Tight Eye; JOSEPH RILEY, III, a/k/a Joe Blow; KHAJAVIUS MITCHELL, a/k/a KJ; TASHIED REED, a/k/a Row, a/k/a Tykune; MICHAEL JACKSON, a/k/a Self-Made, a/k/a MJ; BRANDON ASBERRY, a/k/a B5; JIMMY ROSSER, a/k/a Lil' Jimmy, a/k/a Baby Hazo; KIERRA MAHEIA, a/k/a Erra; CETERA BOWLES-GRIFFIN, a/k/a

55

Bella; ALFONZO NALLS, a/k/a Offset; RAEKWON WILLIAMS, a/k/a B-Ray; and MARCUS RUSSELL, a/k/a Double M; shall forfeit to the United States pursuant to Title 18, United States Code, Section 1963:

(a)    any interest acquired or maintained in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1);

(b)    any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of Title 18, United States Code, Section 1962, which interests, securities, claims, and rights are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963 (a)(2); and

(c)    any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3), including, but not limited to, the following:

(A)    MONEY JUDGMENT:    A sum of money in United States currency representing the amount of proceeds obtained as a result of each offense, or conspiracy to commit such offense, for which the defendant is convicted.

56

(B)   CURRENCY:

     (1)   $1,771.00 in United States currency; and

     (2)   $5,538.00 in United States currency.

(C)   FIREARMS:

     (1)   Black SCCY Industries Model CPX-1 9mm pistol, serial number 035204;

     (2)   Silver Astra Unceta Cia-Guernica Constable .380, serial number 1246034;

     (3)   Taurus 709 Slim 9mm pistol, serial number TJN89877;

     (4)   Glock 27 .40 caliber pistol, serial number YVM117;

     (5)   Zastava Serbia AK-47 style pistol, serial number M85-NP005168;

     (6)   Tula Armory SKS Rifle, serial number KM3515;

     (7)   Springfield Armory XD-45 Model 2 .45 caliber pistol, serial number GM451128;

     (8)   Ruger P95 9mm pistol, serial number 318-66029;

     (9)   Bryco .380 caliber pistol, serial number 905526;

     (10)  Glock 23 .40 caliber pistol, serial number BBFX135; and

     (11)  Assorted ammunition.

Upon conviction of one or more of the offenses alleged in Counts 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, and 20 of this Indictment, the defendants, LINNIE ANDREWS; ADRIAN ANSLEY; FRED ARCENEAUX; BRANDON ASBERRY, a/k/a B5; ERICK BALCAZAR; CETERA BOWLES-GRIFFIN, a/k/a Bella; SHEENA BROWN; PATRICK CAPLE, a/k/a Zoe; TYRONE CLARK a/k/a

Tight Eye; CALMETRIUS DAWKINS, a/k/a Ballyo; TREMAINE GARRISON,
a/k/a Paperwork; J'MON HAWKINS, a/k/a Monto Pronto; CEDRICK HILL,
a/k/a Ced; MICHAEL JACKSON, a/k/a MJ, a/k/a Self-Made; KHAJAVIUS
MITCHELL, a/k/a KJ; MONIQUE PRESTON; TASHIED REED, a/k/a Row,
a/k/a Tykune; JOSEPH RILEY, a/k/a Joe Blow; JIMMY ROSSER, a/k/a Lil'
Jimmy aka Baby Hazo; MARCUS RUSSELL, a/k/a Double M; GARY SARTOR,
a/k/a G-Stacks, a/k/a Stacks; EARL SMILEY; TRAVIS TODD, a/k/a T-Raw;
DEMARIO RIDLEY, a/k/a Lil Yo; RAEKWON WILLIAMS, a/k/a B-Ray; and
KIERRA MAHEIA, a/k/a Erra; shall forfeit to the United States pursuant to Title
21, United States Code, Section 853, any property constituting, or derived from,
proceeds obtained, directly or indirectly, as a result of said violations and any
property used, or intended to be used, in any manner or part, to commit, or to
facilitate the commission of said violations, including, but not limited to, the
following:

(a)    MONEY JUDGMENT:    A sum of money in United States currency
       representing the amount of proceeds obtained as a result of each
       offense, or conspiracy to commit such offense, for which the
       defendant is convicted.

(b)    CURRENCY:

       (1)    $5,538.00 in United States currency.

(c)    A gray 2008 BMW 328i, bearing Georgia license plate number
       RBQ6879, VIN WBAVA375X8NL17821.

(d)    FIREARMS:

58

    (1)    Black SCCY Industries Model CPX-1 9mm pistol, serial number 035204;

    (2)    Silver Astra Unceta Cia-Guernica Constable .380, serial number 1246034;

    (3)    Taurus 709 Slim 9mm pistol, serial number TJN89877;

    (4)    Glock 27 .40 caliber pistol, serial number YVM117;

    (5)    Springfield Armory XD-45 Model 2 .45 caliber pistol, serial number GM451128; and

    (6)    Assorted ammunition.

Upon conviction of the offenses alleged in Counts 18, 19, and 21 of this Indictment, the defendants, RAEKWON WILLIAMS, a/k/a B-Ray; KHAJAVIUS MITCHELL, a/k/a KJ; and JIMMY ROSSER, a/k/a Lil Jimmy, a/k/a Baby Hazo, shall forfeit to the United States pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), any firearm and ammunition used in the commission of said violation, but not limited to, the following;

    (a)    Taurus 709 Slim 9mm pistol, serial number TJN89877;

    (b)    Glock 27 .40 caliber pistol, serial number YVM117; and

    (c)    Ruger P95 9mm pistol, serial number 318-66029;

    (d)    Assorted ammunition.

If, as a result of any act or omission of the defendants, any property subject to forfeiture:

    (a)    cannot be located upon the exercise of due diligence;

    (b)    has been transferred or sold to, or deposited with, a third person;

(c)    has been placed beyond the jurisdiction of the Court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be
       subdivided without difficulty;

//

//

//

//

//

//

//

//

the United States intends, pursuant to Title 18, United States Code, Section 1963(m) and Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), and Title 28, United States Code, Section 2461(c) , to seek forfeiture of any other property of the defendants up to the value of the forfeitable property or seek a money judgment against said defendants for any amount that would constitute the proceeds of such violation.

A _____ True _____ BILL

_____
FOREPERSON

BYUNG J. PAK
 *United States Attorney*

MATTHEW CARRICO
 *Assistant United States Attorney*
Ga. Bar No. 538608

SKYE DAVIS
 *Assistant United States Attorney*
Ga. Bar No. 564709

REBECCA A. STATON
 *Trial Attorney*
Indiana Bar No.  22861-49

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181